LAW OFFICES OF

# *Aidala, Bertuna & Kamins, P. C.*

ARTHUR L. AIDALA*
MARIANNE E. BERTUNA*
HON. BARRY KAMINS (RET.)
HON. JOHN M. LEVENTHAL (RET.)
HON. DAVID L. LEWIS (RET.)
JOHN S. ESPOSITO*
MICHAEL T. JACCARINO
IMRAN H. ANSARI
DIANA FABI SAMSON**
DAVID M. SCHWARTZ+
ANDREA M. ARRIGO*
MICHAEL F. DIBENEDETTO*
LINO J. DE MASI
ROSARIO BONA
GIOVANNI ORLANDO CONTI
CAITLYN CARMICHAEL
ALEXANDRA JO DEBENEDICTIS

*ALSO ADMITTED IN NEW JERSEY
**ALSO ADMITTED IN CONNECTICUT
+ALSO ADMITTED IN D.C.

546 FIFTH AVENUE - STE. 6
NEW YORK, NY 10036
TELEPHONE: (212) 486-0011
FACSIMILE: (917) 261-4832
WWW.AIDALALAW.COM

8118 - 13TH AVENUE
BROOKLYN, NEW YORK 11228
TEL: (718) 238-9898
FAX: (718) 921-3292

OF COUNSEL
JOSEPH A. BARATTA
ANTOINETTE LANTERI
WILLIAM R. SANTO
PETER S. THOMAS
LAWRENCE SPASOJEVICH
SIGURD SORENSON

SENIOR COUNSEL
LOUIS R. AIDALA
JOSEPH P. BARATTA

February 13, 2025

<u>Via ECF</u>

Honorable Kiyo A. Matsumoto
U.S. District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  United States v. Yusufov
     24-CR-326 (KAM)

Dear Judge Matsumoto:

On August 14, 2024, my client, Jacob Yusufov, pled guilty before Your Honor to a single-count Information, charging him with possession of child pornography, in violation of Title 18, United States Code, Section 2252. Please consider the attached memorandum, as well as the attached letters, in imposing an appropriate sentence for Mr. Yusufov.

We thank you for your time and consideration in this matter.

Respectfully,

Michael T. Jaccarino
Aidala, Bertuna & Kamins, P.C.
Attorneys for Jacob Yusufov

cc: AUSA Katherine Onyshko

## I. **Summary**

This case presents the Court with a recurrent, but always difficult, question of criminal justice: What is the appropriate punishment for an individual who, by all accounts, is a fundamentally decent person who has persevered and worked incredibly hard in order to overcome troubling childhood circumstances, but who has admitted involvement in a significant crime – conduct that, seemingly, is the product of years of underlying psychological factors? The number-focused Sentencing Guidelines calls for a sentence of incarceration.  In our view, a sentence to Probation, in combination with home confinement, ongoing sexual offender and psychiatric treatment and sex offender registration, is sufficient but not greater than necessary to comply with the statutory purposes of sentencing, and anything greater would run afoul of the purpose of sentencing this particular individual. In addition, any sentence should aim to serve the goal of reducing recidivism and, as such, a sentence that aims to be treatment-focused is requested. Jacob has been struggling with depression and anxiety for much of his life, which has contributed to a multitude of maladaptive behaviors and personality traits, including substance abuse and an addiction to pornography, all of which led to charged offense conduct.

Jacob accepts full responsibility for his conduct. The following pre-sentence memorandum is an evaluation of Jacob's past and current circumstances and a recommendation for disposition.  It is intended to aid in deliberations, in the belief that an appropriate sentence should derive from not only the case facts, but also from sufficient biographical information of the defendant.  Nothing in this memorandum should be construed as an attempt to diminish or divert from his offense or the need for commensurate punishment, consistent with the full range of sentencing factors and objectives delineated in 18 United States Code § 3553(a).  It is our contention that the case facts and the nature of Jacob's offense conduct, his difficult childhood and exposure to violence and criminal conduct, psychological impairments, time spent overcoming his shortcomings, his record of serving his country and community, and the clear lack of need or constructive use for incarceration, consistently and strongly favors a sentence of probation combined with home confinement, and continued treatment.  To that end, we respectfully, unequivocally, and in the strongest possible terms, recommend a non-custodial sentence, with any additional conditions to be determined by the Court.  We make this request with full knowledge of the potential sentence that Jacob is facing, as well as the need to deter possession of child pornography.  However, several

factors warrant the above request, and we urge the Court to consider the following portrayal of Jacob's history and current circumstances.

In our view, an incarceratory sentence would run afoul of the overarching principle that a sentence should be "sufficient, but not greater than necessary" to serve the statutory goals of sentencing.

## II.    Psychosocial History

### A.    Family Composition & Early Years

Jacob Yusufov, 28 years old, was born on February 15, 1997, in Brooklyn, New York, to the union of Jezebel Alverez and Ronnie Yusufov, and is their only child together.  Jacob's parents were never married, and each eventually married other individuals.  Ms. Alverez, age 43, now lives in Pennsylvania where she works as a photographer and lives with her husband and two children, ages twelve and nine.  Ronnie Yusufov, age 45, lives in New Jersey where he works in a metal factory.  He was previously incarcerated from 2016 – 2021 after his arrest in this District and ultimate conviction for drug distribution and racketeering.  Jabob's father has three children from his marriage, ages 9, 6, and 2. He is currently in divorce proceedings.

Jacob's parents were 16 and 18 years old when he was born.   In 2001, when Jacob was four, his parents separated, and Jacob and his mother moved in with Jacob's maternal grandparents, where they lived in a housing development in Sheepshead Bay, which is where he lived until he was eight years old.  When Jacob was in fourth grade, he moved with his mother to a home in Bensonhurst.  They were lower-middle class, but Jacob's mother worked extremely hard to provide for him, and he did not lack any basic necessities.  As a result, Jacob was very protective of his mother. During this time, Jacob would visit with his father on the weekends, although he rarely spent the night with him.  He spent the majority of his time with his cousins and aunts and uncles on the maternal side of his family.  Jacob reports a very normal childhood at this point in his life, and says that while they did not have the best of everything, he had what he needed.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████    ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



When Jacob was in middle school, his mother entered into a romantic relationship with Jason Buzzard, whom Jacob liked very much. Shortly thereafter, she became pregnant and, after Jacob's stepbrother was born, his mother decided to move to Strasburg, Pennsylvania, where Jason grew up. Jacob was given an incredibly difficult choice. He had just been accepted into the music program at Edward R. Murrow High School, a prestigious program and one that Jacob was excited about beginning. Music has become incredibly important to Jacob, as Jacob frequently pursued activities requiring little or no verbal engagement. At the age of eleven, he taught himself how to play guitar. He loved it and became extremely passionate about playing. He joined the middle school band and, eventually, found like-minded classmates. They formed their own band, focusing on playing blues-rock and covering songs by bands such as Jefferson Airplane, Eric Clapton, and Jimi Hendrix. The music program at Edward Murrow, which also offered programs in art, theatre, and acting, was difficult to get into, and it required Jacob to audition. Getting accepted was one of the first joyous milestones of his early life. As such, when he was given the choice to either move to Pennsylvania, or attend Edward Morrow and move in with his father, he chose to stay in Brooklyn. To him, the decision was incredibly painful, but necessary. He needed to pursue his passion and see it through, even if it meant being separated from his mother. According to Jacob's mother,

> "Music became part of his education and at 11 years old, after only two lessons he decided he could do without an instructor and teach himself. In a couple of weeks he was playing so well, his journey in music had begun. His proficiency with the guitar is truly remarkable. When he is home with us, our house feels alive again with his music." *See*, Attached letter from Jezabel Alvarez Buzzard.

Jacob loved Edward Murrow. He kept mostly to himself and immersed himself in music theory and joined the school band and ensemble. The experience was fantastic. He also found a small group of close friends and continued playing in his band outside of school, which won 2nd

place in 2013 at a "Battle of the Bands" contest in New Jersey. At Murrow, Jacob earned a spot in the pit orchestra and the guitar ensemble, which was composed of approximately 30 guitar chairs. Jacob played lead and rhythm guitar. Jacob loved the freedom to study and play at his own pace. He also began getting interested in reading and writing poetry. Overall, his obsession with music and poetry permitted him to mostly being alone with his thoughts and his instruments.

**B.      Life with Jacob's Father – Drug Dealing, Trauma, and Victimization**

After Jacob's mother moved to Pennsylvania, he first moved in with his maternal aunt, staying there for approximately six months before he moved into his father's home on Staten Island. At the time, Jacob was entering his sophomore year of high school. When he first moved with his father, Jacob's older cousin – Misha – also lived there. Misha was abusing drugs and Jacob's father eventually kicked him out of their home.

Jacob and his father had a cooperative, but emotionally starved, relationship. His father supported and provided for him, but there was little depth to their interactions or overall relationship. To put it bluntly, back then, Jacob's father frequently used pills and he sold drugs. He was always away from home and would be out late almost every night. In the morning, Jacob's father was too tired to wake up and drive Jacob to school in Brooklyn. Instead, he left Jacob money on the table every morning for a taxi. Then, when Jacob got home from school, his father would be gone; he was in the streets, hustling, or at the casino or a strip club. Basically, Jacob was living in a house on Staten Island all by himself. He was alone, and he was lonely. His mother was in a different State and was starting a new family, and he spoke with her infrequently. Jacob would only see her during holidays and over spring break and, over time, she came to Brooklyn less and less often. Also, his high school life was in Brooklyn. As such, when he came home to Staten Island, where he knew no one, he rarely left the house. He had no friends or family in the neighborhood. He stayed in his room, writing poetry, practicing the guitar, using his computer, and going online

Jacob knew, from what he saw, that his father was involved in illegal activity. For years, they never spoke about it, but it was obvious to Jacob. There were strange people around all the time and there were lots of young women at his house, many that Jacob learned were dancers at local gentlemen's clubs. There was a large safe in the home and Jacob never saw what was inside. Many times, in the middle of the night, Jacob would awaken to hear his father hammering away at something. In the morning, Jacob would see crystal rock and other drug residue on the table.

However, although there were certainly drugs in the home, Jacob did not believe that his father sold drugs out of their house.

Although Jacob and his father are very different people, Jacob's father always took care of him financially and Jacob both respected and feared him. To be sure, their differences could not be more glaring. Jacob is petite, skinny, introverted, intellectual and soft-spoken. To Jacob, his father seemed outsized, tough, intimidating, and macho. Certainly, the insecurities Jacob felt were amplified by this disparity.

One night, when Jacob was fifteen years old, Jacob awoke to loud noises coming from downstairs. He was home alone. Jacob knew that people had broken into the house. He was terrified and he got up and locked his bedroom door. The sounds became louder and louder as the burglars rummaged downstairs and preceded upstairs. He sent his father a text message that someone was breaking into the house. He was scared. After the door handle to his bedroom was turned several times, the robber broke the door down. Jacob – terrified – was sitting up in his bed. The man who kicked down the door was wearing a mask and there were two other masked men as well. Jacob immediately knew, even though the burglar had a mask on, that it was his cousin Misha, who had been previously kicked out of the house. They made eye contact. The burglars moved on to other rooms in the home and left. Shortly thereafter, Jacob's father came home with many friends. He was worried and enraged, thinking something had happened to Jacob. After that night, Jacob did not feel safe and could not sleep in that house. So, although Jacob and his father both loved the house, they left, moving in with Jacob's paternal grandmother, where they stayed for about a year until Jacob's father found another home on Staten Island.

## C.    College, Father's Arrest for Narcotics, and the Armed Forces

In 2015, Jacob graduated from Edward Murrow. In August, he enrolled and began college at the New School in Manhattan. Jacob and his father moved to Brooklyn to live with Donna, his father's new wife with whom he was having a baby girl.

A year later, while Jacob was a sophomore in college, Jacob's father was arrested, indicted, and detained in the Metropolitan Detention Center. He was accused of racketeering, illegal gambling, conspiracy to distribute narcotics, possession of a firearm, loan sharking, extortion, and wire fraud. It was alleged that he was a member of a criminal enterprise that operated for years in Brighton Beach and Coney Island, largely making substantial profits trafficking cocaine, in which

Jacob's father was alleged to have directed the large-scale operation, which involved numerous couriers and suppliers. Agents also recovered an illegal .380 caliber firearm from his father's apartment. This was devastating for Jacob. His father, who certainly had his flaws, had always been superhuman to Jacob. And now he was behind bars. Jacob visited him often, and his father apologized and expressed regret for the way he had lived his life and the poor role model he had been. They became closer on a deeper level than ever before. Simultaneously, the stress caused the relationship between Jacob and Donna to deteriorate, and Jacob moved out of her home and in with his grandmother. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Jacob wrote a letter and attended the sentencing hearing, which was incredibly emotional for Jacob and his family. After spending nearly four years in prison, Jacob's father was released. For his entire life, Jacob was always the polar opposite of his father. Besides being quiet and intellectual, he was a rule follower, never having previously been in any trouble. It is now surreal and devastating to both Jacob and his father, that the tables have been turned, and that Jacob will now be the subject of a federal sentencing proceeding.

While his father's criminal case was pending, Jacob continued to attend the New School. However, it was different than Morrow. He was studying jazz, but the musicians were significantly better, and the environment was extremely competitive. Jacob's insecurities, as well as the stress and embarrassment because of his father's arrest, began to creep back in. He lost his self-confidence and abandoned the music program, transferring to the sociology department. He graduated in 2020 with a degree in sociology and, in a totally uncharacteristic and surprising move, enrolled in the United States Army Reserve. In 2020, while his father was still incarcerated, Jacob finished basic training. He then signed an eight-year commitment contract, including six years of active drilling.

The Reserve has been life-changing for Jacob. First and foremost, basic training instilled in him a confidence that he did not know he possessed. He achieved physical and mental feats that he never imagined he could achieve. Following basic training, the Reserve required him to drill and train one weekend per month, as well as two weeks per year over the summer. Drilling, which required Jacob to go to Fort Dix Army Base in New Jersey, involved basic soldiering tasks, such as maintaining rifle and handgun qualifications, physical fitness tests, and job-related activities. Jacob pursued Psychological Operations, which included class work, face-to-face engagement, culture studies, analyzing propaganda, and influence tactics. Jacob also uses information gathered by soldiers in the field and develops products such as flyers, radio broadcasts, social media posts and other products designed to recognize and align themselves with other populations. Last year, in one of his proudest moments, Jacob was recognized by the Battalion Commander for his work using artificial intelligence software to develop products soldiers can utilize within their psychological operations units. His work in this field earned him a Battalion Merit Coin. He has also used his music background to create songs and music embedded with certain messaging that his superiors wanted to convey. Jacob has enjoyed all aspects of his participation in the Army Reserve. The discipline and growth have given him confidence and energy. He has met alot of great people and says his experience has been "awesome!" and he hopes to continue doing it. Simultaneously, he states that although it has been "great, I messed it all up." Although his superiors, who know about the instant charges, have been crystal clear in their willingness to welcome him back, the consequences of a criminal conviction of this nature will almost certainly close of all future possibilities of his participation. According to Jacob's Detachment Sergeant,

> "Throughout my professional relationship with Jacob I have seen nothing but exemplary service for our unit and country. Jacob, when given a task, has always performed exemplary. He has high standards for any task that is given to him and is detail oriented about his work. During a training exercise with our Battalion (about 500 personnel) Jacob was recognized by the command staff for outstanding work and commitment for his ability to adapt and improvise to achieve the mission. From a unit perspective Jacob is always willing to adapt to meet the needs of the Company. Jacob has moved within the unit and is dedicated to expanding his craft in order to best assist the unit and its needs. Throughout his military career, he has exemplified unwavering professionalism in his service to both his unit and country. I have also had the opportunity to interact with Jacob on a personal level when we are off hours. Throughout these interactions I have come to know Jacob as a kind, inquisitive and caring individual. He has shown compassion and loyalty to his fellow soldiers and is

shown to have a deep and caring interest in the betterment of others within the unit." *See*, Attached letter from Sgt. Eric Jones.

Following college and prior to his arrest, Jacob found employment as a freelance journalist. He was writing up to fifteen articles per day for various online websites and newsletters, often aggregating and reporting on previously developed stores. He believes that, in total, he has written nearly three thousand articles. Simultaneously, Jacob began working as a bartender at a local bar near his grandmother's home. He began consuming large amounts of alcohol, marijuana, and cocaine on a daily basis. He believed it eased his anxiety, gave him energy needed to help him write and, in the last couple years, would distract him and keep him out late at bars to avoid being at home and giving in to the temptations on his computer that he knew he could not resist.

**D.     Charged Conduct, Arrest, Treatment and Post-Arrest Circumstances**

The turning point eventually came in a nightmare that spanned several years. That seems the most accurate way to describe the moment when federal agents came into Jacob's home and arrested him. It wasn't the beginning and clearly not the end to the very real terror that has been with him for much of his adult life and continues to be with him. It was, however, the point where he was pulled into the harsh realization that the pain and trauma he believed that he could run from, had never left him, taking up residence in his life and manifesting itself in a darker secret that affected so many more people than just him. Jacob pled guilty to possession of child pornography on August 14, 2024, but his remorse did not begin on the day that he pled guilty or the day that he was arrested. Shame and deep regret for his actions had been building in him since the first time he looked at and

downloaded images of these types of images. However, what did begin shortly after his arrest, was his treatment and the subsequent path to making his remorse more than a gnawing emotion, but a compelling source for action. Jacob has not looked at, possessed or downloaded child pornography since the time of his arrest. His remorse has pushed him to engage meaningfully in therapy to determine the source of the behavior that he has been ashamed of since its inception, and it has forced him to ask himself the difficult questions that, while painful to confront, have caused him to make a great deal of progress in his treatment.

Jacob has been cooperative and fully compliant with all conditions placed on him by the Court and Pre-trial Services, which he has been following for the past thirteen months. In addition, he underwent behavioral evaluations and enrolled in Applied Behavioral Services ("ABS"), where he has been participating and continues to receive group and one-on-one mental health treatment. Following Jacob's arrest, he was evaluated on February 26, 2024, and was admitted to the program for six to eighteen months of outpatient sexual behavior counseling. *See*, Letter from ABS, Attached as Exhibit "A." Jacob is fully engaged in therapy and making significant progress, attending two counseling sessions per week, both group and individual, to address issues pertaining to his sexual behavior. Since his arrest, Jacob has had near perfect attendance, participating in forty-eight (48) sex behavior group counseling sessions, and forty-two (42) individual counseling sessions over the past eleven months. Notably, Jacob "demonstrates active engagement" and is "receptive to therapeutic suggestions." He is currently in the third phase of the three-phase program which is the relapse prevention phase.

Jacob, himself, believes that he is benefitting a great deal from therapy. Opening up about his own experiences with feeling of insecurity, trauma, shame and self-loathing he feels from his actions in this case has not been easy, but Jacob is determined to continue making progress. He recognizes that he has always had choices and that he made wrong ones, and he is finding dignity in admitting his errors. Although he is incredibly disappointed in himself, based on his own self-reflection and his consistent participation, rehabilitation is well underway.  For months, in accordance with the conditions of release, Jacob had not possessed a phone or computer.  However, recently, under the supervision of Pre-Trial, Jacob was given permission to purchase a phone, equipped with tracking and monitoring software that he is now able to use. Moreover, Jacob has worked on genuine self-disclosure and acceptance of responsibility and accountability for his

behavior, as well as gaining insight into his temptations, thoughts, and deviant behavior, so that he can effectively manage them in the future.

Aside from his efforts in treatment and compliance, Jacob has been trying to be productive. He continues to live with his grandmother, Alice Yusufov, with whom he is incredibly close and reliant. They spend a lot of time together, mostly discussing books and movies. According to his grandmother,

> "Jacob has been a big help in my life as a very gentle, caring, good-natured, respectful person.  He helps me with laundry, grocery, shopping, takes all heavy deliveries upstairs. Jacob is always sensitive and delicate with me, trying to protect my well-being from any kind of stress.  He has a strong will to learn and create and he is very intelligent, very knowledgeable in literature, science, history." _See_, Attached letter from Alice Yusufov.

Jacob is also learning the piano, reading music theory again, practicing guitar, and has finished writing a semi-autobiographical novel about a young man struggling with depression while on home confinement.   Throughout it all, he is trying to stay positive.   Although he was embarrassed and nervous about returning to the Army Reserve, he maintains an excellent relationship with his superiors and, despite the pending case, Jacob was welcomed back to Fort Dix. Recently, on October 8th and 9th, 2024, Jacob spent full days at the Base assisting Lockheed Martin contractors in taking inventory of equipment and vehicles and noting deficiencies.

His relationship with his father has also grown and matured.  They have opened up with each other, spoken about their feelings, and have been vulnerable.  Jacob's father was always his hero, but now, after having Jacob when he was only eighteen years old, Jacob's father is now assuming the role of dad.

## III.   Sentencing Considerations

Under the Statutory Provisions, Jacob is eligible for probationary supervision as well as home confinement.  The Sentencing Guidelines contemplated by the Plea Agreement, based on a Total Offense Level of 22[1], and a Criminal History of I, produce a term of 41-51 months' incarceration. We respectfully recommend, again unequivocally and in the strongest terms, that the Court sentence Jacob to Probation, coupled with home confinement, mandated continued treatment, sex offender registration, and any other applicable conditions that satisfy 18 U.S.C. §

---

[1] The PSR calculated a Total Offense Level of 28, with a Guideline Range of 78 to 97 months.

3553(a)—a sentence that is "sufficient, but *not greater than necessary*" (emphasis added) to comply with the purposes set forth in 3553(a)(2). Incarceration in this instance exceeds what is necessary to satisfy those sentencing goals.

In detailing Jacob's history, personal and professional life, and the case facts as we understand them, we do not intend to minimize the offense. However, we firmly believe that his history of being a hardworking and productive member of the community, and a person consistently dedicated to growing, learning, and overcoming his difficult childhood experiences, as well as a crucial member of his family, further mitigate his actions, which are a product of his mental health struggles, and which are being treated. All of this certainly favors leniency and a sentence below the Guideline recommendation.

Regarding the Guidelines, they are a deficient measure of an equitable sentence; advisory only—a point of reference—and just one of several factors the Court must consider. For defendants like Jacob, they are an especially blunt instrument because the sentencing calculus assigns numeric values to a small range of factors pertaining to some aspects of the offense and criminal history. No value is assigned to the "offense and offender characteristics" that must be reviewed under 3553(a)(1), which heavily favor him. The Guidelines overlook the "offender," including:

- the defendant's difficult upbringing
- the psychological impact of the defendant's childhood upon him;
- the defendant's seemingly long-term addiction to pornography;
- family circumstances and reputation in the community;
- a host of life circumstances and events that might and often do explain the offense;
- collateral consequences of incarceration, which are especially relevant when a defendant does not require incapacitation due to violence; and,
- a defendant's efforts to rehabilitate over the past thirteen months.

We submit that these issues, among the entirety of Jacob's social circumstances, are mitigating circumstances that warrant a variance form the Guideline range and a targeted sentence aimed at treating the underlying psychological issues. Although these factors are difficult to quantify, they are potentially far more instructive for sentencing purposes than the core case facts, and vitally important to the fairness that 3553(a) attempts to achieve. In this case, we respectfully submit that the § 3553(a) factors - including Jacob's "history and characteristics," the need for the

sentence imposed to provide "just punishment," and the need to avoid unwarranted sentencing disparities - weigh heavily in favor of a sentence significantly below the sentence recommended by the advisory Sentencing Guidelines. A review of the factors that the Court must consider under §3553(a), as described below, supports this view. The defense urges the Court to consider the following:

### § 3553(a) factors
### (a)(1)  The nature and circumstances of the offense and the history and characteristics of the defendant

Nature and circumstances of the offense

Defendants with no criminal history commonly assert that an offense is uncharacteristic, driven by events and circumstances. The claim is often accurate. Good people sometimes do bad things. While this does apply to Jacob in reductive terms, we believe that the particulars meaningfully distinguish him and merit consideration.

Regarding the broader context for the offense, Jacob was, at the time, a twenty-six-year-old college graduate who voluntarily enrolled in the Army Reserve. In a vacuum, the previous sentence is not extraordinary. However, in Jacob's particular case, we submit that it is. Jacob was born when his parents were teenagers. Then, after spending the majority of his childhood with his mother, she left and moved to another State. Jacob then resided with his father, with whom he had little of a previous relationship. Jacob's father was no ordinary father. He was a high-level criminal involved in a long-term and sophisticated violent criminal enterprise, responsible for gambling, loansharking, and narcotic trafficking throughout Brooklyn. He truly lived a life of crime. The people with whom Jacob's father associated were dangerous. Jacob's father was dangerous. He kept drugs, money and guns in the home Jacob lived in. This home was burglarized in the middle of the night while Jacob, a child at the time, was home alone.

Jacob, on the other hand, could not have been more different than his father. His best friend growing up was his mother. He loved poetry, jazz, playing music, and reading books. He was small and meek, while his father was tough and macho. They were like oil and water. On top of that, although Jacob's father provided for him financially, he was physically and emotionally distant, and was rarely present. To put it simply, Jacob overcame tremendous odds, with almost no real support. He did not fall into a life of delinquency or crime, but became productive and successful. He pursued music, guitar, and other intellectually challenging arenas, ultimately earning a degree in

Sociology.  Then, in a likely subconscious effort to prove his masculinity, he enrolled in the Army and completed basic training, all while his father was in jail on federal racketeering charges.  These accomplishments, particularly in the context of his life and upbringing, are exceptional, and he did them all on his own.

Of course, Jacob did not come out unscathed.  He suffered from depression, anxiety and low self-esteem, all from a very young age.  He had a stutter.  In high school, he was home alone the majority of the time. It is no coincidence that nearly all of his pursuits were solo, accomplished alone, within his own mind or behind a musical instrument, pen, or a computer.  According to Jacob's mother,

> "We took pride in all his accomplishments with him and always assumed he was continuing to thrive despite the circumstances.  I realize now that he shouldn't have been allowed to be on his own so much.  I will always live with the reality that he was a child who needed more guidance but instead was left alone during his most crucial teenage years. *See,* Attached letter from Jezabel Alvarez Buzzard.

In addition, Jacob's social skills, adaptability, and engagement also suffered, and Jacob unfortunately oftentimes returned to the computer for sexual gratification, which gradually escalated from routine pornography, to fetishes, to underage females.  While this does not diminish Jacob's actions, it is not hard to see how Jacob's circumstances could have led him to engage in the charged conduct. Jacob has had ongoing feelings of self-loathing, self-harming behaviors, and a depressed mood since his early adolescence. When he was a child, a psychiatrist prescribed him antidepressant medication. As an adult, in an effort to self-medicate, Jacob turned to alcohol, cannabis and other drugs for the last several years.  He also employed psychological defenses to combat feelings of low self-worth and rejection, and joined the army to deal with feelings of low self-esteem.

Regarding the instant offense, Jacob's pornography addiction has steadily worsened over the last decade and he became utterly consumed by the videos his friend provided for him as a teenager, and instead of his interest evolving as he matured physically and emotionally, Jacob seemingly remained sexually interested in and attracted to post-pubescent females. This was compounded by the fact that Jacob could not successfully interpersonally connect with adult women due to years of low self-esteem and feels of rejection.  As a result, he immersed himself in his computer.  However, we believe that Jacob's risk of recidivism and general risk to the community could be – and is being - successfully mitigated though his engaging in the ongoing, long-term therapies. We believe his

efforts thus far, in combination with strict community, can continue to be maintained as it has o the past thirteen months.

<u>History and characteristics of the defendant</u>

Jacob is someone who came from humble and difficult beginnings and who, on his own, tried to figure out his own path in life.  His solo pursuits include music, writing, poetry, and work as a journalist.  As an adult trying to find himself, he completely came out of his own shell and enlisted in the U.S. Army Reserve.   Jacob has led a life as an extremely hard worker, kind and thoughtful person, knowledge-seeker, and someone who can be counted on. His mother may have described him best when she says:

> "He was driven to learn all he could. Always so curious, intuitive, sensitive and sensible. He was always behaving as a protector. Wanting to make sure that I and his cousins were being treated well. As Jacob and I grew together, my anxieties dissipated, and were replaced by a deep sense of joy and pride in the young man he was becoming. Jacob continued his education into his adult years and joined the Army, something I didn't see coming. He has worked really hard trying to make a name for himself as a journalist, creating a platform for politics and speaking on adversities. He's the person we call if we have questions about politics or current events around the world and even just to inquire about proper verbiage. His siblings know he's the one to call if they have homework trouble or random questions they are sure only he can answer. Jacob's younger brother (13) and sister (9) eagerly anticipate his visits with excitement. They have missed him tremendously these last six months of not having him over.

> He has proven to be a wonderful brother to his siblings, always guiding them with care and understanding. While there may be the occasional sibling quarrel, even with the age gap, Jacob's guidance has helped his younger siblings grow into better individuals both at home and in their daily lives. Jacob and his sister share a deep love for the arts, including painting, drawing, and music. It brings me immense joy and pride to witness their creative collaboration. My daughter considers Jacob to be the best brother in the world, as he not only shares her artistic passion but also respects and values her opinions. In his siblings eyes, Jacob is the epitome of kindness and understanding. They have both expressed how smart he is and how they feel so proud that they have a brother in the Army who will fight to protect them and others. It has been very clear to me that his presence in his siblings' lives has had a profound impact on their growth and development. I have no doubt that his influence will continue to positively impact their lives in the future.

> There are so many things that I can say about Jacob. Being his mother and watching him grow throughout the years has been a blessing in my life. I am

proud of the steps he has made to seek the help he needs." *See*, Attached Letter from Jezabel Alvarez Buzzard.

<u>Personal and Professional Accomplishments Present Strong Mitigation</u>

Jacob's personal and professional accomplishments are also strong mitigating factors that speak volumes to his good character and stability. It is an equity not often seen in these cases and should give Your Honor confidence that Jacob is willing and capable of following directives. Outside of the conduct charged in connection with this case, which amounts to a serious lapse in judgment, but also one that is the product of addiction, one cannot assert with any credibility that Jacob has lived a remotely delinquent or criminal lifestyle. He was and is an inherently good person, an asset to his community, and one who cares deeply about affecting positive change. Jacob's cousin states,

> "He loves his family, especially his younger siblings. He dedicates time to his family even visiting our grandmother weekly for a game of dominoes. He loves reading and music. I used to go watch Jacob perform at bars/cafes, jazz nights, and even battle of the bands, so involved in the music community and has so much creativity. He's respectful and well intentioned. He joined the Army and he was just starting a great job at the United States postal service. He was feeling good about starting this new job and our family was excited for him as well. He has so much potential still inside of him and I believe he could move on from this and live his life to the best of his abilities. I want him to have a chance to fully be an active member of society again. This is the person I know and have known his whole life. Thank you for taking the time to read and consider my letter." *See*, Attached Letter from Megan Rios.

Similarly, Nicholas Ramirez, who is in the Army Reserve with Jacob, says:

> "Since 2019 Jacob and I have been good friends. While our relationship revolved primarily around the Army Reserve, Jacob and I remained in touch and he has helped me during difficult times in my life, allowing me to talk to him about what was going on in my life and supporting me when I needed it. Whenever I needed advice or input in my academics, Jacob was always quick to help me out and give me his feedback." *See*, Attached Letter from Nicholas Ramirez.

The defense strongly urges the Court to consider this history, for which the Guidelines entirely fail to account, which should matter profoundly when determining one's punishment. While the crimes for which Jacob was convicted merit punishment, we firmly believe they are isolated and not representative of his true character, and that his behavior can be effectively treated with ongoing

monitoring and treatment.    We respectfully submit that the portrait of Jacob painted by the numerous letters of support, submitted by a diverse assortment of people from different walks of life, reflects his true character. <u>See</u>, Letters Submitted on behalf of Jacob Yusufov, Attached as Exhibit "B." All of the above factors and history clearly distinguish Jacob from the majority of offenders convicted of similar crimes and, in combination with his difficult childhood and service to our country, are factors that may warrant a non-guidelines sentence.

<u>The Sentencing Guidelines Enhancements Disproportionately Punish Jacob</u>

The Guidelines range inherently skews in favor of greater punishment and is therefore a poor benchmark from which to gauge the suitability of a given sentence.  This is especially relevant to child pornography offenders, where sentencing laws that have greatly increased defendant's prison terms have been strongly criticized. <u>*See*</u>, <u>United States v. Stern</u>, 590 F. Supp. 2d 945 (N.D. Ohio 2008) (recognizing the difference in culpability between viewing and producing child pornography as well as the wide variation of sentences in child pornography cases).

Generally, it has been held that a Court may vary from the Guidelines if such a sentence would yield a punishment that is "greater than necessary." <u>Kimbrough v. U.S.</u>, 552 U.S. 85 (2007). The same has also been held to be true for the child pornography enhancements found in § 2G2.2, which have been held by the Court of Appeals for the Second Circuit to be "eccentric Guidelines of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." <u>United States v. Dorvee</u>, 616 F. 3d 174 (2d Cir.  2010).  In addition, following <u>Kimbrough</u>, the Court held that "a district court may vary from the Guideline range solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." <u>United States v. Cavera</u>, 550 F.3d 180 (2d Cir. 2008).  "District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 – ones that can range from non-custodial sentences to the statutory maximum." <u>Dorvee</u>, 616 F. 3d 174;  <u>*See, also*</u>, Factors That May Warrant Departure/Variance, PSR at ¶ 89, Page 18.

In this case, the Guidelines range is also significantly inflated due to the number of images and videos, as well as the computer enhancement, both of which are antiquated and outdated based on current technology. These enhancements, which correspond to significantly inflated Guideline ranges, cover conduct that has become so ubiquitous that they now apply to the vast majority of cases.    Facilitated by advancements in digital and mobile technology, non-production offenses

increasingly involve voluminous quantities of videos and images. In 2019, non-production offenses involved a medium of 4,265 images, and over 95 percent of non-production offenders received enhancements for use of a computer. Federal Sentencing of Child Pornography: Non-Production Offenses, United States Sentencing Commission. June 2021.  Indeed, despite the Commission's recommendation that the sentencing scheme should be revised to account for these technological changes, emerging social science research, and variations of offender culpability and dangerousness, Congress has not implemented any changed.

As such, the Guidelines, which are not mandatory, have been criticized by the defense bar and many others. We urge the Court to consider the outdated Guideline structure when considering an appropriate variance in this case.   In addition, because of the nature of the offense, Jacob is not eligible for the Zero-Point Offender reduction.  Therefore, a below-Guideline sentence in this case is supported by concerns expressed by appellate and district courts, and would be consistent with the Court's ability to properly comply with its duty to impose sentences that reflect statutory goals that are based on an individual assessment of Jacob.  See, United States v. Chow, 441 F. App'x 44, 45 (2d Cir. 2011)(Holding that Dorvee recognized district courts' post-Booker authority to vary from the Guidelines range and encourages courts to take seriously the discretion in fashioning sentences for child pornography offenders). While we recognize that enforcing federal prohibitions on child pornography is of the utmost importance, for the reasons cited above, we believe a significant departure from the stipulated Guideline range is warranted.


**Evaluation and Recommendation**

Jacob recognizes his guilt and immediately accepted responsibility for his conduct. He recognizes the gravity of the offense and is chastened and profoundly ashamed regarding the impact he has had on the numerous victims.

In detailing Jacob's background and present circumstances, we intend not to diminish or excuse the alleged offense, but to provide explanatory context and propose a just sentence that takes into account the substance abuse and psychiatric struggles that Jacob has struggled with his entire life, which certainly contributed to his participation in the instant offense.

Upon review of the facts of this case, we recognize that the charges are troubling and merit punishment.  In this instance, however, we believe that Jacob's condition and history, the

need for long-term treatment, his long history of substance abuse and clinical depression, as well as certain sex offender registration, warrants little, or no, amount of incarceration[2].

Regarding the allegations, we believe that several aspects of the instant events and their context strongly mitigate Jacob's actions. First, the most serious aggravating factors of such offenses are not present: there is no allegation of physical contact or abuse. Second, while the actions occurred over a significant period of time, these incidents largely involved the viewing of pornographic images and videos. This is not meant to minimize the experiences of the victims as they were reported, but it shows that there is no indication of a larger pattern of conduct, outside of his behavior on the internet.

Indeed, Jacob's obsession with pornography escalated significantly since he was in high school, as the forbidden nature of the images aroused him sexually. This behavior is the combined result of his addictions, social anxiety, and psychological impairments, as well as his repeated expose to pornography in his formative years.

Currently, no segment of our society is more despised than individuals who have committed a sex offense. They are vilified and subject to media misrepresentation under the guise of maintaining communities safe from the "sexual predator." As a result, the Guidelines have addressed this outrage and fear by enacting statutes that keep offenders locked up for exceedingly long periods of time. Ironically, sadly and empirically, it has been shown that these laws do little to protect the public; instead, they serve to ostracize, isolate and destroy any hope of integration or rehabilitation. This ultimately has the opposite effect of the legislative intent. Despite the growing amount of information and statistically-reliable data signifying low risk of re-offense, the Sentencing Guidelines that have been established for sex offender containment continues to be dominated by punitive undertones. Combined with the absence of meaningful and effective treatment during confinement,

---

[2] Should the Court impose an incarceratory sentence, we are asking that the Court recommend that Jacob serve his prison sentence at FMC Devins, which is not only a facility that specializes in long-term mental health care, but is most noted for offering a Sex Offender Treatment Program (SOTP). While the Court cannot mandate that an individual serve a prison term at a specified facility, the Bureau of Prisons reviews and considers recommendations from the Court, especially considering rehabilitative goals, encouragement of programming and facility placement. As discussed above, the Sex Offender Treatment Program offered by FMC Devers employs a wide range of cognitive-behavioral and relapse prevention techniques to help the sex offender manage his sexual deviance both within the institution and in preparation for his release. This, in addition to the mental healthcare at Devers, is vital to Jacob, and will assist in his rehabilitation and re-entry into society. We strongly urge the Court to recommend mental health and sexual offender treatment, RDAP, and placement at FMC Devers.

as well as the inhumane conditions upon release, it is far less likely that this cohort of individuals will become productive members of society.

Jacob's difficult upbringing and exposure to criminal activity from his father and paternal role model could have led Jacob to being enmeshed in a life of crime. Instead, he veered in the opposite direction, studying music, sociology, and poetry, and enrolling in the armed forces in order to overcompensate for his small stature and demure personality. He also, in an attempt to be anonymous and avoid his depressive symptoms, retreated inwards and to the world within his computer. All of this certainly favors leniency. A review of the factors that the Court must consider under § 3553(a), as described below, supports this view.

At this time, Jacob comes before the Court asking not for the Court to overlook his actions, but to see them in the context of all of his experiences. He asks that the Court consider not just his crime but his progress in treatment, the accomplishments he has earned through hard work and the person that his loved ones and his community have seen him grow to be despite his past trauma and adversity. For these reasons we ask that the Court sentence Jacob to a lengthy period of probation with strict conditions, namely requiring that he continue to be monitored and continue to engage in treatment, specifically at ABS with his current therapist. It is clear that the implementation of not only substance abuse and mental health treatment, but sex offender targeted treatment, would substantially reduce the risk of recidivism and address the multitude of maladaptive behaviors. Indeed, Jacob has expressed a positive attitude toward intervention. *See*, Exhibit A. As such, we believe that continued intensive psychotherapy and sex offender treatment would drastically mitigate the risk of re-offending. Indeed, Jacob's efforts in receiving treatment over the past thirteen months, as well as having met all conditions imposed by Pre-trial, highlights this point.

A sentence of a period of probation would be sufficient but not greater than necessary to comply with the statutory purposes of sentencing. While a period of probation would be a departure from Jacob's sentencing guidelines, his treatment needs, personal history and sincere remorse are significant mitigating factors. The factors used to assess and predict future recidivism, such as prior criminal history, education and employment, alcohol and drug problems, anti-social behavior, as well as ties to his community, all support the argument that Jacob is highly unlikely to reoffend. He has no prior criminal history. He has very strong ties to the community demonstrated by the letters submitted on his behalf from individuals who know, trust and believe in him.

Thank you for your time and consideration in this matter.

Respectfully submitted,

_____/s/_____

MTJ:dg

Michael T. Jaccarino
Aidala, Bertuna & Kamins, P.C.
Attorneys for Jacob Yusufov